# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

EMMANUEL SMITH,              )
                            )
       Plaintiff,        )
                            )
v.                          )       No.:   3:07-CV-150
                            )              (VARLAN/GUYTON)
USF HOLLAND, INC.,          )
                            )
       Defendant.        )

## <u>MEMORANDUM OPINION</u>

This is an employment discrimination action between plaintiff Emmanuel Smith ("Plaintiff Smith") and defendant USF Holland, Inc. ("Defendant USF Holland"). The case is before the Court for a decision on the merits following a one-day bench trial that took place on November 17, 2008. Plaintiff Smith seeks relief for alleged violations of 42 U.S.C. § 1981 and the Tennessee Human Rights Act. [*See* Doc. 33 at 2.] Defendant USF Holland contends that it did not discriminate against Plaintiff Smith because of his race. [*See id*.]

After giving careful consideration to the testimony of the witnesses, the exhibits introduced at trial [*see* Doc. 44], the transcripts of the proceedings [*see* Doc. 45], the proposed findings of fact and conclusions of law [*see* Docs. 50, 51], the trial and post-trial briefs [*see* Docs. 37, 49, 55, 56], and the applicable law, the Court makes the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).

# I.    FINDINGS OF FACT[1]

1.    Defendant USF Holland is a trucking company with a terminal located Knoxville, Tennessee.  [Doc. 45 at 97.]

2.    Plaintiff Smith is an African-American.  [Doc. 45 at 20.]

3.    Plaintiff Smith, a truck driver, has worked at Defendant USF Holland's Knoxville Terminal as a dock worker and as a city driver since September of 1988.  [Doc. 45 at 19-20.]

4.    A dock worker loads freight onto the trucks.  [Doc. 45 at 21.]

5.    City drivers have routes within a certain radius of a particular terminal and have multiple stops on those particular routes.  [Doc. 45 at 126.]  City drivers select their routes or "runs" based on seniority.  This process involves the dispatcher calling out the available runs for the day, and the drivers then bid on routes in the order of their seniority.  [Doc. 45 at 21, 28, 29.]

6.    During the relevant period, Plaintiff Smith was the second-most-senior driver during his shift.  [Doc. 45 at 22.]

7.    City drivers are paid on an hourly basis. [Doc. 45 at 126.]  During the relevant period, Plaintiff Smith was paid $22.50 per hour and $33.75 per hour for overtime.  [Doc. 45 at 30.]

---

[1]The Court only makes the findings of fact necessary to reach its conclusions of law.

8.    One of the routes out of the Knoxville Terminal is known as the "Mountain City run." [Doc. 45 at 29.]  For several years prior to 2004, Plaintiff Smith drove the "Mountain City run" because "[i]ts the furthermost run out of the Knoxville terminal and it has the most overtime on it."  According to Plaintiff Smith, the Mountain City run is "one of the better runs, one of the easier runs."  [Doc. 45 at 96.]  If the Mountain City run was unavailable, Plaintiff Smith would attempt to take another city run with the most miles.  [Doc. 45 at 27, 29, 30.]

9.    One of Defendant USF Holland's clients, A.Y. McDonald ("AYM"), is on the Mountain City run.  [Doc. 45 at 34.]  In 2004, Susan Dayton ("Ms. Dayton"), a managerial employee at AYM, requested that Defendant USF Holland no longer send Plaintiff Smith to the AYM plant.  [Doc. 45 a 194.]

10.   Around the time of this request, Ms. Dayton had conflicts with one of her employees at AYM, Ms. Linda Dickson ("Ms. Dickson").  Ms. Dickson was on a 60-day probationary period at AYM due to a negative performance evaluation by Ms. Dayton.  [Doc. 45 at 199.]  Ms. Dayton, in part, blamed Plaintiff Smith for Ms. Dickson's performance problems, namely socializing with Ms. Dickson when she was supposed to be performing her job duties.  [Doc. 45 at 199.]

11.   Ms. Dickson, who identifies herself as "Indian black," had "difficulties" with Ms. Dayton for finding errors with her work performance.  [Doc. 45 at 232, 237.]  Ms. Dickson later ended her employment with AYM when she stopped showing up for work.  [Doc. 45 at 240.]

3

12. Ms. Dayton had dissatisfaction with Plaintiff Smith's work performance for (1) being late with picking up freight on one occasion; (2) visiting with Ms. Dickson in unauthorized areas on two occasions; and (3) needing to request that he leave AYM's plant with his trailer due to limited dock doors. [Doc. 45 at 215, 216, 217.]

13. At the time of Ms. Dayton's original request, Frank Rose ("Mr. Rose") was the terminal manager of the Knoxville Terminal. [Doc. 45 at 35, 97.] He informed Plaintiff Smith of Ms. Dayton's request that he no longer make stops at AYM. [Doc. 45 at 36, 37.] Afterwards and continuing through the date of trial, Plaintiff Smith has not been allowed to bid on the Mountain City run when AYM was a stop. [Doc. 45 at 42-43.] However, he has been permitted to take the Mountain City run when AYM is not one of the stops on the route. [Doc. 45 at 112.]

14. A correspondence from Ms. Dayton about Plaintiff Smith is missing from Plaintiff Smith's personnel file. [Doc. 45 at 99-100.] However, Mr. Rose also spoke to Ms. Dayton telephonically about her request. [Doc. 45 at 104.] Plaintiff Smith's personnel file includes an undated note written by Mr. Rose, which states, "A.Y. McDonald - Susan does not want Emmanuel at dock. Emmanuel Smith is bothering other Employees - taking to [sic] long on dock." [Doc. 45 at 115; D. Ex. 24.]

15. Mr. Rose did not state to Plaintiff Smith that he was prevented from making stops at AYM because he is African-American. [Doc. 45 at 67.]

16. Other drivers employed by Defendant USF Holland have been prevented from making stops when requested by clients. [Doc. 45 at 133, 172.] Some of these drivers were

4

Caucasian.  [Doc. 45 at 134, 172-73.]  Client requests for certain drivers to not make stops at certain places "happens a lot in the freight business."  [Doc. 45 at 143.]

17. On or around May 22, 2006, Ms. Dayton refused a delivery from Plaintiff Smith due to her previous request to Defendant USF Holland to no longer send him to the AYM plant.  After a verbal exchange where Plaintiff Smith told her "you do that," Ms. Dayton wrote Mr. Rose, "I appreciate your efforts to ensure we get any of the highly qualified and courteous drivers USFH employs out of the Knoxville terminal."  [P. Ex. 3.]

18. Ms. Dayton has requested that particular truck drivers not be allowed to come to AYM's plant.  [Doc. 45 at 219-20.]  She views such requests as "not that major a thing to me" and has made these requests with other trucking companies as well as with another driver employed by Defendant USF Holland.  [Doc. 45 at 219-20.] Some of the drivers she has requested not make stops at AYM have been Caucasian. [Doc. 45 at 220.]

19. During the relevant period, Plaintiff Smith worked an average of 50 hours per week. [Doc. 45 at 67.]  After being banned from making stops at AYM, Plaintiff Smith made up the difference in overtime hours by working on the weekend.  [Doc. 45 at 34.]

20. City drivers like Plaintiff Smith had the opportunity to bid on "utility runs" to Atlanta or Nashville.  [Doc. 45 at 74-75.]  These runs differ from city runs to the extent they are night runs that require a driver to stay up all night. [Doc. 45 at 175-76.]

5

## II.    CONCLUSIONS OF LAW

Plaintiff Smith has asserted racial discrimination claims against Defendant USF Holland pursuant to 42 U.S.C. § 1981 ("Section 1981") and the Tennessee Human Rights Act ("THRA"). [Doc. 33 at 2.] Section 1981 provides:

(a)     Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)     "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981.

The THRA provides:

(a)     It is a discriminatory practice for an employer to:

(1)     Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin . . . .

Tenn. Code. Ann. § 4-21-401(a)(1). Notably, the Tennessee Supreme Court has recognized that the analyses for THRA and federal civil rights claims are the same. *Campbell v. Florida*

6

*Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Thus, the Court will address the Section 1981 and THRA claims together under the framework established for federal civil rights claims.[2]

To establish a racial discrimination claim, a plaintiff must establish that: "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a) [or the THRA]." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). A plaintiff can establish the "intent" element either by direct evidence or inferentially with circumstantial evidence. *Id.* (citing *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985)).[3] In the present case, the circumstantial evidence framework is applicable to the racial discrimination claims of Plaintiff Smith. Under the circumstantial evidence framework, "the plaintiff must present a *prima facie* case, at which point the defendant must come forward with a legitimate, non-discriminatory reason for its action." *Amini*, 440 F.3d at 359. If the defendant proffers such a reason, "the plaintiff has the burden of offering evidence that the defendant's justification

---

[2]The Court notes that Defendant USF Holland has again raised an argument regarding the statute of limitations for Plaintiff Smith's THRA claim previously asserted on summary judgment. [*See* Doc. 17-1 at 8-9.] On summary judgment, the Court found this argument unavailing. [Doc. 25.] At this time, the Court remains unpersuaded and incorporates its previous analysis of this issue for purposes of this opinion. [*See* Doc. 25 at 17-20.]

[3]Though Plaintiff Smith maintains that this case involves direct evidence of intent as he did on summary judgment, the Court previously determined that the direct evidence framework is inapplicable to this case. [*See* Doc. 25.] The evidence presented at trial has not changed the Court's previous determination on this issue. Incorporating its previous analysis on this issue [*See* Doc. 25 at 6-8], the Court continues to find the direct evidence framework inapplicable to this case.

7

is a pretext that masks its true discriminatory intent." *Id.* at 359-60; *see also McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

## A.     Prima Facie Case

To establish a *prima facie* case, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for his job and performed it satisfactorily; (3) that despite his qualifications and performance, he suffered an adverse employment action; and (4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).

The Court now proceeds to determine whether Plaintiff Smith has established these *prima facie* elements by a preponderance of the evidence. First, as an African-American, he is a member of a protected class. [Doc. 45 at 20.] Thus, the first element is satisfied. Second, Plaintiff Smith is qualified for his job as a dock worker and city driver as evidenced by his employment in this position for over twenty years with Defendant USF Holland. [Doc. 45 at 19.] This element is further evidenced by Plaintiff Smith's high seniority as a city driver. [Doc. 45 at 22.] Though there is evidence that he has been disciplined in the past for certain conduct, Plaintiff Smith remained employed by Defendant USF Holland in the same position during the relevant period. [Doc. 45 at 19.] Additionally, there is evidence in the form of a medical examination report that Plaintiff Smith met the physical qualification requirements for drivers under applicable regulations. [D. Ex. 22, 23.] Thus, the Court finds

8

that Plaintiff Smith has established the second *prima facie* element, namely that he was qualified for his job and performed it satisfactorily.

Next, the Court must determine whether Plaintiff Smith suffered an adverse employment action. A "materially adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth, Inc.*, 524 U.S. 742, 761 (1998). The change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (citations omitted). Examples of a "materially adverse change" include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Id.* (citing *Ford v. Gen. Motors Co.*, 305 F.3d 545, 553 (6th Cir. 2002)). A reassignment accompanied by changes in a plaintiff's pay or work hours can sufficiently satisfy the adverse employment action criteria. *See Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).

Though Plaintiff Smith testified that he worked an average of 50 hours per week before and after his ban from AYM [Doc. 45 at 67], this fact does not necessarily preclude him from establishing the adverse employment action element. Plaintiff Smith also testified that he lost two to three hours per week in overtime due to not being able to drive the Mountain City run. [Doc. 45 at 34.] The testimony about working the same average of hours is not inconsistent with the testimony about losing two to three hours of overtime per week.

9

In other words, the two to three hour reduction in working time per week still falls within the scope of a general estimate of working 50 hours per week. Furthermore, Plaintiff Smith testified that he lost $2000 to $3000 annually due to the AYM ban. [Doc. 45 at 34, 35.] A loss in pay qualifies as an adverse employment action. For example, money lost when a firefighter was repeatedly denied "acting time" would "more than amply qualify as a materially adverse action." *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006). By specifying the amount of overtime lost due to his ban from AYM, Plaintiff Smith's case is distinguishable from those where a plaintiff provided only a terse statement about losing overtime. *See Broska v. Henderson*, 70 F. App'x 262, 268 (6th Cir. 2003) ("[Plaintiff] has not even stated how much overtime he lost due to the retaliation.").

Arguably, there is evidence that Plaintiff Smith had alternatives to the Mountain City run suggesting that he did not experience an adverse employment action. For example, there were other routes that Plaintiff Smith could likely successfully bid on due to his seniority. However, the Court notes that these other routes are of lesser distances than the Mountain City run. [P. Ex. 5.] As Plaintiff Smith testified, he would still need to make up the lost hours by working on weekends. [Doc. 45 at 34.] There has also been testimony about the alternative of "utility runs" to Atlanta or Nashville, which involved higher pay per hour than the Mountain City run. [Doc. 45 at 74-75.] Utility runs are different from the Mountain City run to the extent they are night runs that require the driver to stay up all night. [Doc. 45 at 175-76.] While the "utility runs" option may resolve Plaintiff Smith's loss in overtime

compensation, they nonetheless evidence the existence of an adverse employment action due to the "different responsibilities" associated with these options.[4]

The final *prima facie* element is whether Plaintiff Smith was treated less favorably than a similarly situated individual outside his protected class. To be deemed "similarly situated," the Sixth Circuit has recognized that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). More recent cases have held that the "appropriate test" is to "look at those factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity in all respects." *Jackson v. FedEx Corporate Servs.*, 518 F.3d 388, 394 (6th Cir. 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *see also Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 458 (6th Cir. 2004) ("In employment discrimination cases, the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated;' rather, this court has held that the plaintiff and the employee with whom the plaintiff seeks to

_____

[4]On summary judgment, the Court was unpersuaded by Plaintiff Smith's contention that his alleged humiliation, embarrassment, and emotional distress alone constituted an adverse employment action. An adverse employment action requires a change in employment status. *See Ellerth*, 524 U.S. at 761. Though his subjective feelings may aid in determining whether an adverse employment action occurred, his feelings in and of themselves are insufficient to establish this *prima facie* element. *See Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (noting that a "bruised ego" was not enough to constitute an adverse employment action).

11

compare himself or herself must be similar in 'all of the *relevant* aspects.'") (citation omitted).

In this case, the arguably "similarly situated" individuals are the Caucasian drivers permitted to bid on the Mountain City run while Plaintiff Smith was not. However, there is a differentiating circumstance that distinguishes Defendant USF Holland's treatment of Plaintiff Smith, namely Ms. Dayton's complaints regarding Plaintiff Smith's conduct and her request that he no longer make stops at AYM. While Plaintiff Smith has attempted to show that Ms. Dayton's request was the result of race discrimination thereby negating any differentiating circumstances from the other city drivers, the Court finds that Plaintiff Smith has failed to meet his burden for this element. While Plaintiff Smith testified that Mr. Rose said that Ms. Dayton "is having a problem with a black person that is employed out there and while she is having these problems with that black person, she didn't want me coming back out there" [Doc. 45 at 37], the Court notes that Plaintiff Smith later testified that Mr. Rose merely "would indicate" that AYM had "a problem with black people so our black people can't go there." [Doc. 45 at 67.] Indeed, Plaintiff Smith later testified that Mr. Rose did *not* tell him that he was prevented from making stops at AYM because of his race. [Doc. 45 at 67-68.] The inconsistencies in Plaintiff Smith's testimony about what Mr. Rose actually said rather than "indicated" weakens the persuasive weight of his testimony regarding this element.

In contrast, there has been consistent trial testimony from Ms. Dayton and Mr. Rose about why she requested that Defendant USF Holland stop sending Plaintiff Smith on runs

12

to AYM. Mr. Rose testified about Ms. Dayton's concerns with Plaintiff Smith "wandering into the facility into the warehousing area and speaking with their employees and delaying their duties." [Doc. 45 at 104.] This testimony is consistent with Ms. Dayton's testimony that she placed some blame on Plaintiff Smith for socializing with an AYM employee. [Doc. 45 at 199.] Both the testimony of Mr. Rose and Ms. Dayton are consistent with Mr. Rose's handwritten note, which stated: "A.Y. McDonald - Susan does not want Emmanuel at dock. Emmanuel Smith is bothering other Employees - taking to [sic] long on dock." [Doc. 45 at 115; D. Ex. 24.] Additionally, Mr. Rose further testified that Ms. Dayton never mentioned anything about having problems with a black employee. [Doc. 45 at 104.] The consistencies between the accounts of Mr. Rose, Ms. Dayton, and the handwritten note lead the Court to afford greater weight to the evidence showing that Ms. Dayton's request was based on her perception of Plaintiff Smith's conduct, not his race.

Plaintiff Smith argues that an adverse inference should apply to the missing correspondence from Ms. Dayton regarding her request about Plaintiff Smith coming to AYM. An adverse inference, or inferring a fact based on lost or destroyed evidence, is one of many different kinds of evidence for spoliated evidence. *Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009). The Sixth Circuit has recognized that federal law applies to spoliation sanctions and that the inherent powers of federal courts include broad discretion to craft proper sanctions for spoliated evidence. *Id.* at 651. For an adverse inference inquiry, at least two district courts in this circuit have held that "a party seeking an adverse inference . . . based on the destruction of evidence must establish (1) that the party having control over the

13

evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Bancorpsouth Bank v. Herter*, No. 04-2420 B, 2009 WL 1596654, at *15 (W.D. Tenn. June 5, 2009) (quoting *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, No. 06-CV-13143, 2009 WL 998402 (E.D. Mich. Apr. 14, 2009)). The burden rests with the party seeking to use the spoliated evidence. *Herter*, 2009 WL 1596654, at *15. Furthermore, a trial court is not required to grant a request for an adverse inference even if all the elements entitling a party to adverse inference have been met. *Id.*

In this case, the Court declines to grant Plaintiff Smith's request for an adverse inference. For the third element, "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Herter*, 2009 WL 1596654, at *16. In *Herter*, a district court denied a party's request for an adverse inference when, for purposes of the third element, the party offered no evidence to support its claim of what the destroyed documents may have established. *Id.* Likewise in this case, Mr. Rose agreed with Plaintiff Smith's counsel that Ms. Dayton's letter was vague and required a subsequent telephone call to Ms. Dayton to clarify the reasons for her request. [Doc. 45 at 103.] Plaintiff Smith has not offered other evidence from which the Court could infer that the correspondence had any indication of racial motivation by Ms.

14

Dayton. Accordingly, the Court, in its discretion, declines his request for an adverse inference regarding this missing correspondence.

A subsequent communication from Ms. Dayton to Mr. Rose on May 22, 2006, further shows that her request regarding Plaintiff Smith was based on her perception of his conduct. Ms. Dayton wrote, "I appreciate your efforts to ensure we get any of the highly qualified and courteous drivers USFH employs out of the Knoxville terminal." [P. Ex. 3.] This email shows that Ms. Dayton had expectations about courteousness that, in her opinion, Plaintiff Smith did not meet. There is no indication in the email that Ms. Dayton's request was due to Plaintiff Smith's race.

As for Ms. Dickson's testimony regarding Plaintiff Smith's conduct while making stops at AYM, the Court notes that Ms. Dickson left her employment with AYM on less-than-amicable terms, namely she left one day and did not come back to work. [Doc. 45 at 240.] Ms. Dickson also testified about her difficulties with her supervisor, Ms. Dayton, while employed at AYM. [Doc. 45 at 232.] In particular, Ms. Dickson testified about how she could not see the errors that Ms. Dayton found when reviewing Ms. Dickson's work performance. [Doc. 45 at 231-32.] This testimony shows that Ms. Dayton's standards for the work environment differ from those of Ms. Dickson. Ms. Dickson's testimony shows that Ms. Dayton had strict expectations for the work environment as to her own employees, which was consistent with her complaints to Mr. Rose about Plaintiff Smith's conduct.

The strict expectations of Ms. Dayton for drivers is further evidenced by her other requests that truck drivers not be allowed to come to the AYM plant. [Doc. 45 at 219-20.]

15

At trial, Ms. Dayton testified that she had made this sort of request on several occasions to other truck companies because "drivers were rude" and "not cooperative." [Doc. 45 at 220.] She testified that these other drivers were Caucasian. [Doc. 45 at 220.] Such evidence further shows that Ms. Dayton has high expectations for the truck drivers coming to AYM, regardless of race.

In light of this evidence, the Court finds that Plaintiff Smith has failed to meet his burden in establishing that he was treated less favorably than a similarly situated individuals outside his protected class. Though Caucasian city drivers employed by Defendant USF Holland were permitted to bid on the Mountain City run, the differentiating circumstance of Ms. Dayton's request that Plaintiff Smith no longer come to the AYM plant due to his conduct precludes Plaintiff Smith from comparing himself to the other city drivers who were not the subject of client complaints. The evidence fails to establish that Ms. Dayton was motivated by race and, instead, shows that Ms. Dayton has certain expectations for the work environment at AYM that differed from others like Ms. Dickson, Plaintiff Smith, and other drivers banned from AYM. Thus, the Court concludes that Plaintiff Smith has not met his burden of establishing the final *prima facie* element for his race discrimination claims.

### B. Pretext

In addition to not establishing all of the *prima facie* elements for his racial discrimination claims, Plaintiff Smith has also failed to meet his burden of establishing pretext. Under the burden-shifting framework, a defendant "must come forward with a legitimate, non-discriminatory reason for its action." *Amini*, 440 F.3d at 359. In the present

case, Defendant USF Holland's proffered reason is that its client, AYM, requested that Plaintiff Smith not be permitted to return to its facility due to his unprofessional behavior while at that facility.

Thus, the burden returns to Plaintiff Smith, who must prove that Defendant USF Holland's proffered nondiscriminatory reason was actually a pretext to hide unlawful discrimination. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). Plaintiff Smith may establish pretext by showing: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's action; or (3) the proffered reasons were insufficient to motivate the employer's action. *See id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

The first showing "consists of evidence that the proffered bases for the plaintiff's [adverse employment action] never happened." *Manzer*, 29 F.3d at 1084. As previously discussed, the evidence shows that Ms. Dayton communicated to Mr. Rose that she no longer wanted Plaintiff Smith to make stops at AYM due to his previous conduct. This evidence includes the consistent testimony of Ms. Dayton, Mr. Rose, and his handwritten note regarding Ms. Dayton's request. [*See* Doc. 45 at 104, 115, 199; D. Ex. 24.] Furthermore, there is evidence that Ms. Dayton perceived Plaintiff Smith as less-than-courteous. [P. Ex. 3.] Though Ms. Dickson denied socializing with Plaintiff Smith while employed at AYM, the Court considers Ms. Dickson's testimony in light of her less-than-amicable end of employment with AYM and her strained relationship with Ms. Dayton. Thus, the Court finds

that there is support for Defendant USF Holland's proffered basis for Plaintiff Smith's ban from AYM, namely Ms. Dayton's request based on her complaints regarding Plaintiff Smith.

Under the second showing, a plaintiff "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. While there is evidence that Plaintiff Smith informed one of his supervisors, Mr. Matthew Taylor ("Mr. Taylor"), about his belief that Ms. Dayton's request was racially motivated [Doc. 158], the Court notes that Mr. Taylor spoke with Ms. Dayton about Plaintiff Smith's concerns. [Doc. 45 at 172.] Based on this conversation, Mr. Taylor did not feel that there was a discriminatory motive behind her request. [Doc. 45 at 172.] This testimony is consistent with other evidence showing that Ms. Dayton had a non-racial motivation for her request, namely her high expectations of those working at AYM, including employees in her department, like Ms. Dickson, and truck drivers making stops there, like Plaintiff Smith. [Doc. 45 at 219-20, 231, 232, 240.] Though there is testimony by Plaintiff Smith and Ms. Dickson about their belief that Ms. Dayton had discriminated against them due to their race, there is insufficient evidence providing a bases for these beliefs. As previously noted, less weight is afforded to Plaintiff Smith's inconsistent testimony about what Mr. Rose stated rather than indicated about Ms. Dayton's request. Ms. Dickson's testimony is considered in light of her unhappy employment with AYM and her difficult relationship with Ms. Dayton. Additionally, Ms. Dayton's non-racial motivation is further evidenced by her requests to ban certain other Caucasian drivers when she perceived their conduct as improper.

18

While one witness, Mr. George Moir ("Mr. Moir"), testified that he heard a dispatcher tell Plaintiff Smith that Mountain City is "a white man's run," the evidence shows that the dispatcher was not involved in the decision to stop Plaintiff Smith from making stops at AYM and that Mr. Rose made the decision before informing the dispatcher of the decision. [Doc. 45 at 182.] As a result, this testimony fails to establish that race played a role in Mr. Rose's decision to stop Plaintiff Smith from making stops at AYM. In light of all of this, the Court concludes that Plaintiff Smith has not met his burden of establishing pretext under the second showing described in *Manzer*, 29 F.3d at 1084.

The third showing ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not subject to an adverse employment action even though they engaged in substantially identical conduct to that which the employer contends motivated a defendant's actions toward a plaintiff. *Manzer*, 29 F.3d at 1084. In this case, Mr. Rose testified that there were at least two other drivers employed by Defendant USF Holland who were prevented from making stops at certain locations due to clients' requests. [Doc. 45 at 133-34.] For example, Mr. Rose complied with a client's request that a Caucasian driver no longer make deliveries to it because the driver spent too much time meeting with his wife, who was employed by the client. [Doc. 45 at 133.] Mr. Rose also testified about not permitting a certain Caucasian driver to come to the client's place of business because he was rude to them. [Doc. 45 at 134.] Mr. Taylor testified that another Caucasian driver, Mr. Paul Fetak, was not permitted to deliver to a client after exchanging words with a client's employee. [Doc. 45 at 173.] Mr. Moir, a Caucasian employee of

19

Defendant USF Holland, testified that he too had been subjected to client requests to not send him any longer and that such requests "happen[] a lot in the freight business." [Doc. 45 at 143.] Furthermore, as discussed previously, there is evidence that Ms. Dayton made similar requests of other trucking companies because "drivers were rude" and "not cooperative." [Doc. 45 at 220.] Notably, Plaintiff Smith has not offered evidence of Defendant USF Holland disregarding client requests to ban certain Caucasian drivers when there were complaints about the behavior of those drivers. In light of all of this, Plaintiff Smith has failed to establish the third showing of pretext involving other employees who are not in the protected class and not subject to the same treatment as Plaintiff Smith despite engaging in substantially identical conduct. The evidence shows that Defendant USF Holland complied with these client requests based on driver conduct, even when the subject drivers were Caucasian.

For these reasons, Plaintiff Smith has failed to meet his burden of establishing pretext in this case. In the Court's opinion, the evidence fails to show that Defendant USF Holland's nondiscriminatory reason is actually an attempt to hide unlawful discrimination. Thus, in addition to making a prima facie showing, Plaintiff Smith has also failed to establish pretext in this case.

## III.    CONCLUSION

In summary, the Court finds that Plaintiff Emmanuel Smith has failed to prove by a preponderance of the evidence that (1) he was treated less favorably than a similarly situated individual outside his protected class and that (2) the reason articulated by Defendant USF Holland for its decision to prevent Plaintiff Smith from making stops at AYM was pretextual. Based upon the foregoing findings of fact and conclusions of law, the Court will find in favor of Defendant USF Holland, Inc.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE